1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

CHRISTOPHER ANDREW BISTRYSKI,

                              Plaintiff,

        v.

DOC HEALTH SERVICES OF STAFFORD
CREEK CORRECTIONS CENTER, et. al.,

                              Defendants.

Case No. C17-5369 RJB-TLF

REPORT AND
RECOMMENDATION

Noted for <u>March 6, 2020</u>

This matter is before the Court on defendants' motion for summary judgment.
Dkt. 89. Plaintiff Christopher Bistryski has brought this suit pursuant 42 U.S.C. § 1983
against defendants for deliberate indifference to plaintiff's medical needs in violation of
his Eighth Amendment rights, as well as related claims under the Americans with
Disabilities Act and the Rehabilitation Act. Plaintiff's Second Amended Complaint, Dkt.
64, at 2. The District Court has referred this matter to Magistrate Judge Theresa L.
Fricke. *Mathews, Sec'y of H.E.W. v. Weber*, 423 U.S. 261 (1976); 28 U.S.C. §
636(b)(1)(B); Local Rule MJR 4(a)(4). For the reasons set forth below, the undersigned
recommends the Court grant defendant's motion and dismiss plaintiff's complaint.

As discussed below, the Court can conclude based on the summary judgment
declarations and documents that, drawing reasonable inferences in favor of the non-
moving party, there may be a genuine dispute of material fact whether plaintiff had a
cognitive disorder that was a serious medical need at some point between June 2015,

REPORT AND RECOMMENDATION - 1

1  when he first reported his symptoms, and June 2017, when plaintiff's mental health

2  assessment indicated that plaintiff had experienced a quantifiable decline in cognitive

3  abilities. *See* Declaration of Counsel re Motion for Summary Judgment, Dkt. 90-1, at 36,

4  41. At least one treating provider has found plaintiff's neurocognitive symptoms to be

5  "important and worthy of comment or treatment." *See, e.g.*, Dkt. 90-1, at 51, 79.

6      The Court should find, nonetheless, that there is no genuine dispute of material

7  fact as to whether any of the defendants were deliberately indifferent to plaintiff's

8  cognitive decline. In other words, based on the uncontested facts, no reasonable jury

9  would find that ARNP Allbert, Dr. Gage, or Dr. Hammond was deliberately indifferent to

10 plaintiff's serious medical need.

11

12                    FACTUAL AND PROCEDURAL HISTORY

13      Plaintiff is an inmate currently housed at Monroe Corrections Center (MCC),

14 where plaintiff alleges defendants violated his Eighth Amendment rights, by acting with

15 deliberate indifference to his serious medical need in diagnosing and treating his

16 cognitive disorder. Dkt. 64, at 2.  Plaintiff also alleges disability discrimination claims

17 under the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA). *Id.* Plaintiff

18 seeks injunctive relief in the form of court-ordered treatment by neurologist and

19 monetary damages.

20      Defendants are the following three individuals: Sheryl Allbert, ARNP, Bruce

21 Gage, M.D., and Steven Hammond, M.D. In a previous order, the Court granted a

22 motion to dismiss by Defendants Light, Sinclair, Casey, Dr. Furst, DOC Health Services

23 of Stafford Creek, DOC Health Services of Monroe Corrections Center Special Offender

24 Center, and the Medical Care Review Commission. Dkt. 58.

25

Defendant Allbert directly treated plaintiff for multiple conditions during the period in question. Dr. Gage consulted with plaintiff's treating providers over the treatment decision to order an MRI and reviewed the results with plaintiff. Dr. Hammond was a member of the Care Review Committee that decided whether plaintiff should receive a neurology consultation for his complaints. All three individuals were involved in plaintiff's care following his transfer to MCC in 2015.

In September 2014, plaintiff began experiencing cognitive symptoms while housed at Stafford Creek Corrections Center (SCCC). While plaintiff has previously been diagnosed with multiple mental health disorders, including bipolar disorder, anxiety, social phobia, and PTSD, when plaintiff's symptoms began, he was not receiving medication or treatment for any mental health concerns. Dkt. 90-1, at 18.

Plaintiff began to repeatedly experience days-long periods in which he found he had, among other similar cognitive symptoms, an inability to focus, impaired short-term memory function, mental fogginess and confusion, vertigo and strange speech errors such as reversing word order. Dkt. 64, at 5. He would feel fatigue afterward and have white spots appear in his vision when trying to concentrate, which became more difficult for him to do. *Id.* After each episode, plaintiff noticed that he had increased difficulty reading and studying and lingering issues with memory, attention, energy and mood. *Id.*

Plaintiff has been a corresponding student at Ohio State University at all times relevant to the complaint, and he is most distressed by the effect of his symptoms on his ability to complete his coursework, as his GPA has changed from 4.0 to 3.9. *Id.* at 6. Plaintiff noticed that previously stimulating and enjoyable tasks, such as reading long texts and solving physics, have become less interesting and feel extremely difficult. *Id.*

Plaintiff indicates that in January 2015, he became concerned about the seriousness of his symptoms after a conversation with his parents in which they noted his lack of focus. Dkt. 64, at 6.

On June 21, 2015, plaintiff sought medical assistance from the medical center at SCCC, expressing that "something was seriously wrong with him" and asking to be tested for neurological illness and possible exposure to toxins. Dkt. 64, at 7. Plaintiff reported his suspicion that he had been poisoned, based on the episodic pattern and cumulative nature of the cognitive changes he had noticed. *Id.*

After a physical examination and mental health evaluation in the inpatient unit, plaintiff was released back to his normal housing assignment under protest. *Id.* Plaintiff wished to stay out of his unit, where he feared he might be further exposed to whatever caused his symptoms. *Id.* Plaintiff asserts that out of his fear he engaged in "drastic measures" and cut himself – intending to be sent to mental health custody – after which he "succeeded" in being reassigned to the SCCC inpatient unit, until he was transferred to MCC on July 9, 2015. *Id.* at 9.

On the day after plaintiff's transfer to MCC, July 10, 2015, plaintiff was seen by Defendant Allbert for follow-up treatment related to his lacerations from his self-harm incident, where no notes state that he brought up cognitive issues. Dkt. 90-1, at 19. On July 24, 2015, plaintiff returned to Defendant Allbert for treatment of an unrelated medical condition and complained of his cognitive issues and expressed his suspicion of neurotoxin exposure. *Id.* at 20. Defendant Allbert noted his complaints in her appointment notes and scheduled him for treatment of his other condition. *Id.* Plaintiff wished to be tested for exposure to the chemical dichloromethane, but defendant ruled

1  dichloromethane out as a possible cause of plaintiff's symptoms and indicated that she

2  could not test for chemical exposure without more information. Dkt. 90-1, at 20; Dkt. 64,

3  at 9.

4          Plaintiff submitted a grievance requesting "adequate medical care" and

5  challenging defendant's refusal to test for chemical exposure on August 18, 2015. Dkt.

6  64, at 59. On September 21, 2015, the grievance was administratively withdrawn for

7  failure to rewrite according to grievance procedures to address staff at MCC, not SCCC.

8  *Id.* at 61. Meanwhile, on September 4, 2015, plaintiff was started on lithium to treat his

9  mental health conditions, including somatic paranoia, by a non-defendant medical

10  provider. *Id.* at 57. Defendant Allbert next saw plaintiff for treatment of another medical

11  condition in March 2016 and continued to treat him for other conditions in the months

12  following, but plaintiff did not again seek Defendant Allbert's assistance with his

13  cognitive decline until August 2016. Dkt. 90-1, at 29.

14          Afterward, plaintiff repeatedly expressed his concern over his cognitive

15  symptoms and his fear of poisoning to his assigned mental health counselors, including

16  non-defendant Dr. Ashirova. Dkt. 64, at 64-71. Based on plaintiff's desire to prove he

17  was not delusional, Dr. Ashirova agreed to administer a mental health appraisal,

18  including the IQ test WAIS-IV, to plaintiff, which was completed on September 3, 2016.

19  *Id.* at 73. Plaintiff generally scored from average to superior, but plaintiff's full scale

20  score IQ test was 117-126, less than the 130-135 IQ score plaintiff had received from a

21  previously administered 2006 WAIS-III IQ test. *Id.* at 76. Dr. Ashirova noted that plaintiff

22  demonstrated signs of cognitive slowing affecting his working memory, processing

23  speed and perceptual reasoning. *Id.* She found the discrepancy over ten years to be

24

25

REPORT AND RECOMMENDATION - 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

significant, but "not unusual." Dkt. 90-1 at 77. She recommended further testing be done to investigate plaintiff's symptoms, and noted that, objectively, the nature of the decline did not prove plaintiff's belief that his mental functioning had permanently deteriorated. *Id.*

Plaintiff met with Defendant Allbert on August 11, 2016 and expressed his fear that someone was tampering his food and his refusal to eat anything that was not sealed. Dkt. 90-1, at 30. Defendant Allbert discussed the possibility with plaintiff that this was likely not real, and plaintiff indicated that he was still testing the belief for himself and recognized that his suspicions may stem from another mental health concern. *Id.* Allbert assessed plaintiff as paranoid, but she also gave plaintiff a Health Status Report (HSR) authorizing plaintiff to receive his meals as snacks in sealed packages to counteract plaintiff's weight loss from refusing to eat certain foods. *Id.* at 30-32.

Around that time, from September to November 2016, plaintiff discussed his fear of being poisoned, his sensation of paranoia and his concern over his perceived cognitive decline with non-defendant ARNP Arica Keyser. Dkt. 64, at 11. On September 19, 2016, ARNP Keyser noted that plaintiff had been refusing medication for a couple months and agreed to take plaintiff off his prescribed lithium treatment, based on plaintiff's concern that medication side effects were contributing to his cognitive decline. Dkt. 90-1, at 27. She referred plaintiff to counseling to rule out mental health or medical causes of his symptoms, assessed plaintiff as increasingly paranoid and delusional, and noted reports from other offenders that plaintiff had taken to scattering baby powder on his floor to monitor for intruders. *Id.* at 47. ARNP Keyser referred plaintiff to an

1  ophthalmologist for his complaints of spots in his vision, and the eye exam revealed no

2  clinical findings to explain plaintiff's symptoms. Dkt. 90-1, at 50, 55.

3       On November 10, 2016, Defendant Allbert saw plaintiff again, noting the results

4  of his testing that showed slowing of his thought process. Dkt. 90, at 54. Allbert noted

5  that Dr. Gage had recommended a brain MRI of his brain after consulting with one of

6  plaintiff's non-defendant mental health providers and plaintiff's cranial nerve exam

7  results were normal. *Id.*at 51, 59. On November 15, 2016, Allbert and the rest of

8  plaintiff's treatment team consulted with Defendant Dr. Gage and recommended that

9  plaintiff have an MRI to rule out demyelinating disease. *Id.* at 56. Dr. Gage approved the

10 MRI request. Dkt. 64, at 12.

11      On December 20, 2016, Allbert noted that plaintiff had not been eating anything

12 but packaged food due to his ongoing fear of poisoning. She renewed plaintiff's HSR for

13 packaged snacks during his meals and also recommended that he be weighed

14 periodically. Dkt. 90-1, at 59-60.

15      On January 19, 2017, plaintiff underwent an MRI, which came back as a

16 "[n]ormal MRI of the brain without and with contrast." Dkt. 90-1, at 63-64. On February

17 17, 2017, Dr. Gage went over the results with plaintiff and explained the lack of physical

18 findings. Dkt. 64, at 12. Plaintiff asked Dr. Gage for a consultation with a neurologist,

19 which Dr. Gage indicated was unlikely to be approved by plaintiff's Care Review

20 Committee (CRC). *Id.* Dr. Gage indicated that plaintiff would continue to receive annual

21 mental health appraisals to test cognition and that plaintiff's normal medical providers

22 would take note of plaintiff's symptoms as he reported them. *Id.*

23

24

25

1    On February 19, 2017, plaintiff met with non-defendant mental health provider

2    Jessica Aaron to go over the MRI results, who noted that plaintiff had met with Dr. Gage

3    already regarding the MRI results. Dkt. 90-1, at 65. Plaintiff expressed that he was not

4    surprised that the MRI had come back negative but that it strengthened his belief that

5    he was being poisoned. *Id.*

6    Plaintiff returned to Defendant Allbert for treatment on March 2, 2017, where he

7    repeated his request for a neurology consultation. Dkt. 90-1, at 67. Allbert expressed to

8    plaintiff that the request was unlikely to succeed, but she put in the neurology

9    consultation request to the CRC. Dkt. 64, at 107-108. The consultation request noted

10   that there was a "[l]ittle bit of cognitive slowing but not enough to worry about per

11   psychologist…." *Id.* at 107. Allbert noted that plaintiff had complaints of a serious

12   decline in cognitive functioning and that he believed that he was being poisoned or had

13   a brain tumor, and that plaintiff's MRI results were normal and showed no neurological

14   deficits. *Id.* at 108.

15   The CRC determined a neurology consultation was not medically necessary at

16   the time. Defendant Dr. Hammond chaired and moderated the CRC discussion, and Dr.

17   Hammond signed the decision of the CRC in denying the neurology consultation. Dkt.

18   64, at 64, 113. This appears to have been Dr. Hammond's only involvement in plaintiff's

19   care. Plaintiff went on to file a grievance asking to appeal the CRC's decision in March

20   2017. *Id.* at 115-117.

21   In June 2017, plaintiff underwent his annual mental health appraisal, and non-

22   defendant provider Dr. Pruden noted that plaintiff had scored 29 out of 30 on the

23   Montreal Cognitive Assessment and that this indicated normal functioning. Dkt. 90-1, at

24

25

75-76. Plaintiff had an annual mental health update with Dr. Pruden in August 2017 and underwent cognitive testing as part of this update. Dkt. 90-1 at 80. This included WJ-III and WMS-IV tests (which test similar components of intelligence as plaintiff's 2016 WAIS-IV IQ test, but do not provide an overall "IQ" score). Dkt. 90-1, at 81. Dr. Pruden noted that his scores were in the same average to superior range, with plaintiff's average processing speed still skewing his cognitive abilities lower than plaintiff's 2006 results. *Id.*

Dr. Pruden found no significant differences between the 2016 testing and the 2017 testing, although she noted a slight decline in working memory compared to plaintiff's results in 2016. *Id.* at 82. Dr. Pruden noted plaintiff's continuing belief that someone was poisoning him and indicated her belief that these thoughts and symptoms were better accounted for by "an extreme form of social anxiety." *Id.* at 83. On September 19, 2017, Dr. Pruden issued plaintiff a Mental Health Treatment Plan listing a diagnosis of "unspecified neurocognitive disorder, mild" and calling for treatment to focus on exploring with plaintiff alternative explanations for plaintiff's symptoms to poisoning, such as normal aging, nutritional deficits, and mental health concerns. Dkt. 64, at 122-123.

On September 26, 2017, plaintiff took the Mental Health Treatment Plan to Defendant Allbert and repeated his request for a neurologist to treat his neurocognitive disorder. Dkt. 90-1, at 77. Allbert noted that plaintiff had a perceived decline in reading, thinking, and memory deficits and that plaintiff believed that he had a neurological disease that a neurologist could detect and diagnose. *Id.* Allbert agreed to put in a request for a neurologist again, which she did on October 26, 2017. *Id.* at 86.

1      Allbert's request noted that the testing had measured a decline and that plaintiff

2   had a significant discrepancy between his working memory, processing speed, and to

3   some degree his perceptual reasoning. Dkt. 90-1, at 86. Allbert's description of plaintiff's

4   mental testing results compared plaintiff's 2016 GAI score to his 2006 IQ score,

5   indicating a smaller decline than a direct comparison between the two measured IQ

6   scores. Dkt. 90-1, at 86. Allbert also noted that her exam indicated no abnormal findings

7   or neurological deficits. *Id.* The request was deemed not medically necessary by the

8   MCC Facility Medical Director. *Id.* at 87.

9      There are no further records of Allbert's involvement in plaintiff's care. Plaintiff

10  alleges that on or after March 19, 2018, plaintiff's mental health provider Dr. Pruden

11  emailed Allbert to make another CRC request for a neurology consultation and that

12  Allbert refused. Dkt. 64, at 19. Plaintiff has failed to produce evidence of either the email

13  exchange or Allbert's refusal after completion of discovery. Allbert is now retired from

14  the Department. Dkt. 89, at 10.

15     Plaintiff continued to regularly meet with non-defendant mental health providers

16  in 2017. Dkt. 90-1, at 88-90. On October 19, 2017, plaintiff met with Dr. Gage and his

17  mental health treatment team. *Id.* at 89. The team agreed that a neurology consultation

18  was not recommended based on only minor deficits in processing speed and no positive

19  indicators of acute, severe neurological symptoms. *Id.* At some point after plaintiff's

20  2017 mental health evaluation, plaintiff became uncertain that he had been poisoned

21  and now considers poisoning to be only one possible explanation for what he perceives

22  to be his "brain injury." *See* Dkt. 64, at 15.

23

24

25

1    Plaintiff had his annual cognitive testing on August 20, 2018, and this testing was

2    documented in a mental health update. Dkt. 90-1, at 95-99. The testing (this time,

3    WAIS-IV and WMS-IV tests) revealed that plaintiff's cognitive abilities, including full-

4    scale IQ score, had remained equivalent since 2016. *Id.* at 95-96. Although a significant

5    discrepancy remained between plaintiff's average processing speed and other superior

6    to very superior cognitive abilities, the update noted that most of his scores had actually

7    improved from his 2016 and 2017 scores. *Id.* at 96.

8    In January 2019, plaintiff was also sent to an outside neurologist through the

9    offender paid health program. Dkt. 90-1, at 110-117. The neurologist indicated that her

10   workup "has not revealed etiology of new cognitive/mentation/sensorium/sleep

11   challenges." *Id.* at 115. The provider did discuss the possibility of vitamin and

12   neurotransmitter deficiencies or sequelae from prior psychotropic medications. *Id.* 115-

13   116. The provider mentioned further testing that could be done.  *Id.* at 116. In March

14   2019, the outside neurologist spoke to plaintiff's Department primary care provider. *Id.*

15   at 121. The provider explained the offender paid health care process and discussed the

16   neurologist's recommendation for a follow-up ANA test. *Id.* Plaintiff had a blood test that

17   included a ANA test in June 2019 that was negative. *Id.* at 122-123.

DISCUSSION

18

19   Summary judgment is supported "if the pleadings, the discovery and disclosure

20   materials on file, and any affidavits show that there is no genuine issue as to any

21   material fact and that the movant is entitled to judgment as a matter of law." Federal

22   Rule of Civil Procedure (FRCP) 56(c). The moving party bears the initial burden to

23   demonstrate the absence of a genuine dispute of material fact for trial. *Celotex Corp. v.*

24   *Catrett,* 477 U.S. 317, 323 (1986). A genuine dispute concerning a material fact is

25

presented when there is sufficient evidence for a reasonable jury to return a verdict for

the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). A

"material" fact is one which is "relevant to an element of a claim or defense and whose

existence might affect the outcome of the suit," and the materiality of which is

"determined by the substantive law governing the claim." *T.W. Elec. Serv., Inc. v. Pacific*

*Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

When the Court considers a motion for summary judgment, "[t]he evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in [their]

favor." *Id.* at 255. Yet the Court is not allowed to weigh evidence or decide credibility.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 at 255. If the moving party meets their

initial burden, an adverse party may not rest upon the mere allegations or denials of his

pleading; his or her response, by affidavits or as otherwise provided in FRCP 56, must

set forth specific facts showing there is a genuine issue for trial. FRCP 56(e)(2). The

Court may not disregard evidence solely based on its self-serving nature. *Nigro v.*

*Sears, Roebuck & Co.,* 784 F.3d 495, 497 (9th Cir. 2015).

If a summary judgment motion is filed early in the litigation – before there has

been a realistic discovery opportunity relating to each party's theory of the case – the

District Court should grant any FRCP 56(d) motion "fairly freely." *Jacobson v. United*

*States Department of Homeland Security,* 882 F.3d 878, 883-84 (9th Cir. 2018).

In response to the motion for summary judgment, the nonmoving party is

required to present specific facts, and cannot rely on conclusory allegations. *Hansen v.*

*U.S.,* 7 F.3d 137, 138 (9th Cir. 1993). The court must determine whether the specific

facts that are presented by the non-moving party, considered along with undisputed

context and background facts, would show that a rational or reasonable jury might

return a verdict in the non-moving party's favor based on that evidence. *Emeldi v.*

*University of Oregon,* 698 F.3d 715, 728-29 (9th Cir. 2012).

To state a claim under 42 U.S.C. § 1983, a complaint must allege: (a) the

conduct complained of was committed by a person acting under color of state law, and

(b) the conduct deprived a person of a right, privilege, or immunity secured by the

Constitution or laws of the United States. *See Parratt v. Taylor*, 451 U.S. 527, 535

(1981), *overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986). Section

1983 is the appropriate avenue to remedy an alleged wrong only if both of these

elements are present. *See Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985).

### Eighth Amendment Standard Regarding Medical Care

To state an Eighth Amendment claim relating to medical care, a plaintiff must

include factual allegations that a state actor acted, or failed to act, in a manner that

shows deliberate indifference to his serious medical needs. *Jett v. Penner*, 439 F.3d

1091, 1096 (9th Cir. 2006). A plaintiff alleging a claim of deliberate indifference must

prove two elements: the seriousness of the prisoner's medical need and the nature of

the defendant's response to that need. *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th

Cir. 1992). This includes "both an objective standard – that the deprivation was serious

enough to constitute cruel and unusual punishment – and a subjective standard –

deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012).

Deliberate indifference is shown by "a purposeful act or failure to respond to a

prisoner's pain or possible medical need, and harm caused by the indifference." *Jett*,

439 F.3d at 1096 (*citing McGuckin*, 974 F.2d at 1060). The defendants must have

known of and disregarded an excessive risk to the plaintiff's health. *Farmer v. Brennan*,

511 U.S. 825, 837 (1994). A difference of opinion about treatment between plaintiff and

prison medical authorities "does not give rise to a § 1983 claim," but it does not preclude

one, either. *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Hamby v.*

*Hammond*, 821 F.3d 1085, 1097 (9th Cir. 2016) (Gould, Judge, concurring in part and

dissenting in part).

The medical need must be serious in the constitutional sense, and the

indifference to medical needs must be substantial. Indications of a serious medical need

that falls within the Eighth Amendment protection include: if a plaintiff shows the

existence of an injury that a reasonable doctor or patient would find to be important and

worthy of comment or treatment; a medical condition that would significantly affect an

individual's daily activities; and a condition that creates chronic and substantial pain.

*Colwell v. Bannister,* 763 F.3d 1060, 1066-67 (9th Cir. 2014). Allegations that amount to

mere indifference, negligence, or medical malpractice will not support an Eighth

Amendment cause of action under § 1983. *Broughton v. Cutter Laboratories*, 622 F.2d

458, 460 (9th Cir. 1980) (*citing Estelle*, 429 U.S. at 105–06). "Medical malpractice does

not become a constitutional violation merely because the victim is a prisoner." *Estelle*,

429 U.S. at 106; *see also McGuckin*, 974 F.2d at 1050. Even gross negligence is

insufficient to establish deliberate indifference to serious medical needs. *See Wood v.*

*Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

If the prison's medical staff is not competent to examine, diagnose, and treat

inmates' medical problems, they must "refer prisoners to others who can." *Hoptowit v.*

*Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982), *overruled on other grounds*, *Sandin v.*

*Conner*, 515 U.S. 472 (1995); *see also Ortiz v. City of Imperial*, 884 F.2d 1312, 1314

(9th Cir. 1989) (per curiam). A failure to competently treat a serious medical condition,

even if some treatment is prescribed, may constitute deliberate indifference in a

particular case. *Id.* And, "[d]eliberate indifference may be found where prison officials

fail to provide an inmate with medical care for reasons unrelated to the medical needs of

the prisoner, such as administrative concerns." *Oliver v. Carey,* 315 Fed. Appx. 649 (9th

Cir. 2009) (citing *Jett*, 439 F.3d at 1097) (In *Oliver*, the plaintiff alleged that defendant

doctors were deliberately indifferent when they denied his grievance appeal based on

an eight to ten month delay for orthopedic services, and because "the scheduling of

contract providers was beyond the authority of CSP staff.").


<u>Plaintiff's claims against ANRP Sheryl Allbert</u>

Plaintiff argues that Defendant Allbert unreasonably relied upon her own non-

specialized conclusions instead of the recommendations of the plaintiff's treating

specialists." Plaintiff's Response to Defendants' Motion for Summary Judgment, Dkt. 96,

at 27. Plaintiff faults Allbert for writing a CRC request in March 2017 that discussed

plaintiff's mental health history. *Id.* Plaintiff asserts that the opinion of his providers was

improperly swayed by Allbert insinuating that plaintiff's belief in having been poisoned

was a delusion or a product of paranoia. Dkt. 64, at 14. Although he may have

expressed implausible fears, plaintiff argues, his complaints were not mere delusion,

and Allbert was wrong to include prejudicial descriptions of his paranoia in her

presentation to the CRC. *Id.* Additionally, plaintiff takes issue with defendant Allbert's

1    October 2017 CRC request for purportedly misrepresenting the nature of his 2006 IQ

2    test and by extension, the severity of his cognitive decline. Dkt. 64, at 17-18. The Court

3    should find that these actions do not support a claim of deliberate indifference.

4    Defendant Allbert met with plaintiff repeatedly as his primary care provider, and

5    the record does not support finding that Allbert was deliberately indifferent in either

6    denying a neurological consultation or, more generally, in her treatment of his cognitive

7    complaints. In March 2017, Allbert presented plaintiff's case to the CRC for

8    consideration of a referral to a neurologist, with her notes that there were no

9    neurological deficits and that plaintiff's cognitive slowing was not enough to worry about

10   "as per [the] psychologist [Dr. Ashirova]." Dkt. 90-1, at 68-69. Allbert's CRC request

11   noted that plaintiff had claimed that he was being poisoned, and that his other providers

12   had assessed plaintiff as possibly delusional. This cannot be taken as more than a

13   factual representation of plaintiff's treatment history and providers' opinions, and the

14   inclusion of this information was relevant to the CRC's deliberation. The facts, taken in

15   the light most favorable to plaintiff, indicate that Allbert believed that plaintiff was indeed

16   delusional and that his symptoms were attributable to his delusions. However, those

17   facts are insufficient for a jury to find that Allbert deliberately ignored a substantial

18   medical risk to plaintiff.

19   In October 2017, Allbert submitted another denied consultation request for a

20   neurologist which stated that she noted no abnormal findings or neurologic deficits

21   during her exam. Dkt. 90-1, at 86. Plaintiff asserts that in failing to distinguish between

22   plaintiff's GAI and full spectrum IQ score, Allbert misled the CRC as to the severity of

23   plaintiff's cognitive decline. Dkt. 64, at 18. Based on plaintiff's reasoning, Allbert would

24

25

have informed the CRC that plaintiff's cognitive function decreased less than it actually did. Despite this, Allbert accurately conveyed there had been a decline from 2006 to 2017, including the "significant discrepancy" between his processing speed and his other abilities noted as most significant by plaintiff's other providers. Dkt. 90-1, at 86. Furthermore, the evidence indicates that all of plaintiff's testing returned results in the average to superior range. *Id.* at 80-81. Given these results, the failure to distinguish between GAI and full scale IQ scores does not indicate that Allbert knew and failed to communicate a more serious risk to plaintiff. The Court should find that even taken in the light most favorable to plaintiff, these facts do not show any knowledge of a serious medical risk, and therefore they do not establish deliberate indifference. Accordingly, the undersigned recommends that the claims against Allbert be dismissed.

<u>Plaintiff's Claims against Dr. Gage</u>

With respect to Dr. Gage, plaintiff argues that Dr. Gage's failure to order tests for plaintiff beyond the 2017 MRI constituted deliberate indifference. The record does not indicate, and plaintiff does not present, any evidence that additional tests were recommended or necessary, beyond the annual mental health assessment plaintiff underwent. Dr. Gage supported an MRI being given to rule out demyelinating disease of plaintiff's central nervous system, but no evidence indicates other diseases for which testing would be needed. *See* Dkt. 90-1, at 149. In the absence of such evidence, the decision to not seek further evaluation could not be found medically unacceptable under the circumstances. Based on plaintiff's records in 2017, Dr. Gage would not have found that any medical provider, let alone a specialist, recommended further care and treatment.

1    Plaintiff argues that Dr. Gage should have submitted a request in February 2017

2  for plaintiff to have a neurological consultation, but this argument is not persuasive,

3  given that Allbert (plaintiff's primary care provider) submitted a request for a neurology

4  consultation on March 2, 2017—a little over two weeks after plaintiff's February 2017

5  meeting with Dr. Gage.

6    Dr. Gage met with plaintiff as part of consultations in the process of plaintiff being

7  sent for an MRI in late 2016 and early 2017. Dkt. 90-1 at 56. There is nothing in the

8  record showing that Dr. Gage knew or believed plaintiff to have a serious medical need

9  for further neurological consultation. Plaintiff asserts that Dr. Gage was aware of

10 plaintiff's extreme distress regarding his condition, and that Dr. Gage unduly dismissed

11 plaintiff's concerns. Where Dr. Gage's notes indicate that while he was aware of

12 plaintiff's 2016 findings of decreased cognitive function, Dr. Gage has explained these

13 findings were "noted to be non-specific, possibly normal, and/or could have been due to

14 a variety of conditions, including mental illness." Dkt. 90-1, at 147. Dr. Gage approved

15 plaintiff's MRI, but none of the results of the MRI nor his notes indicate that he was

16 aware of a "brain injury" to plaintiff after the MRI. *Id.* at 56, 146-150. In light of Dr.

17 Gage's limited involvement in plaintiff's care, which ended in 2017, and the lack of

18 sufficient evidence that additional care was needed under the circumstances, there is

19 no genuine dispute of material fact that would show that Dr. Gage was aware of a

20 substantial risk to plaintiff's health or that he acted unreasonably in light of such a risk.

21 Plaintiff has failed to show that Dr. Gage's actions constituted deliberate indifference.

22 Therefore, the claims against Dr. Gage should also be dismissed.

23    Plaintiff's claims against Dr. Hammond

24

25

1    The claims against Dr. Hammond arise from Hammond's position as chairperson

2    on the CRC that denied plaintiff a neurology consultation. This alone is not sufficient to

3    establish deliberate indifference on the part of Dr. Hammond. Even accepting that Dr.

4    Hammond personally voted against the intervention as part of the CRC, this allegation

5    is insufficient to show deliberate indifference on the part of Dr. Hammond. At the time of

6    the CRC's decisions in 2016 and 2017, no provider had recommended that a neurology

7    consultation was required. The CRC Report indicated that Plaintiff had no neurological

8    deficiencies and that there was not enough cognitive slowing to generate concern. Dkt.

9    90-1, at 68-69; *id.* at 136 (indicating that Dr. Hammond was not aware of any serious

10   illness suffered by plaintiff besides his underlying mental illness). The CRC report

11   concluded that the neurological consultation was not medically necessary and opted for

12   clinical monitoring instead. Dkt. 90-1, at 68.

13   Plaintiff concedes that Dr. Hammond knew very little about his circumstances

14   and concedes that Dr. Hammond's only involvement was sitting on a CRC in March

15   2017. Yet, plaintiff argues that Dr. Hammond failed to exercise due diligence and that

16   Dr. Hammond "should have inquired more into" the CRC request. Dkt. 96, at 30. A

17   failure to exercise due diligence in investigating the CRC report, even if such an

18   omission would be negligent, any such negligence is insufficient to support an Eighth

19   Amendment claim. Therefore, plaintiff has failed to show that the denial of this

20   neurological consultation violated plaintiff's Eighth Amendment rights and plaintiff's

21   claims against Dr. Hammond should be dismissed.

22

23   <u>Qualified Immunity</u>

24

25

1    Unless plaintiff makes a two-part showing, qualified immunity shields government

2  officials from liability. The plaintiff must show both: the official(s) violated a federal

3  statutory or constitutional right, and – at the time of the alleged act or failure to act there

4  was clearly established law that defined the contours of the federal right objectively

5  putting the official(s) on notice – i.e., any reasonable official in the defendant's shoes

6  would understand that what they are doing is unlawful. *City of Escondido v. Emmons,*

7  139 S.Ct. 500, 503 (2019); *District of Columbia v. Wesby,* 138 S.Ct. 577, 589 (2018).

8    Here, the undersigned finds that plaintiff has failed to present sufficient evidence

9  of a constitutional violation. If the Court finds that a constitutional violation occurred,

10  defendants are still entitled to qualified immunity because the law was not clearly

11  established. At the time of defendants' involvement in plaintiff's care, no medical

12  provider recommended that plaintiff go to a neurologist or indicated a belief that the

13  failure to provide access to a neurologist was medically unacceptable under the

14  circumstances.

15    Defendants argue that plaintiff's claims are most similar to the Seventh Circuit's

16  decision in *Wilson v. Adams*, 901 F.3d 816 (7th Cir. 2018) (inmate's Eighth Amendment

17  claim was rejected for a lack of sufficient evidence of an unspecified cognitive disorder,

18  where the provider had referred the inmate for further testing, consultation and

19  observation). Where there was no evidence the provider was aware of a serious

20  medical condition and refused to provide proper treatment, the Seventh Circuit did not

21  find a constitutional violation. *Wilson v. Adams*, 901 F.3d 816 at 819. In this case, there

22  is arguably enough evidence for plaintiff to submit the issue of the seriousness of his

23  medical condition to a jury. Yet there is insufficient evidentiary support for plaintiff to

24

25

present the issue of deliberate indifference – so this case is somewhat analogous to the *Wilson* case.

Plaintiff argues that a showing of deliberate indifference alone is enough to defeat qualified immunity, but this argument is not persuasive. Dkt. 96, at 34. Plaintiff's complaints of cognitive disorder have not been diagnosed, despite reasonable attempts by prison staff to monitor and observe them. There is insufficient evidence in the record to show that any of the three named defendants were aware that plaintiff suffered from a serious cognitive disorder and refused to provide him with recommended treatment. Plaintiff's argument that defendants knew of and declined to treat plaintiff's serious brain injury is not supported by the record of undisputed facts. Taking the facts in the light most favorable to plaintiff, even if the Court were to accept the existence of a brain injury, this would not show defendants' knowledge or subjective indifference.

Therefore, defendants' actions have not been made clearly unconstitutional by previous case law, and the Court should find defendants are entitled to qualified immunity.

### Plaintiff's ADA and RA claims

To prove a public entity violates Title II of the ADA, an individual must show: (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the n benefit of some public entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of [his] disability.

*Simmons v. Navajo Cnty, Ariz.*, 609 F.3d 1011, 1021 (9th Cir. 2010), *overruled in part on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 160 (9th Cir. 2016). The ADA recognizes both disparate treatment and disparate impact theories of discrimination. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003). A prison does not violate the ADA by not providing adequate medical treatment. *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011 at 1022. The Ninth Circuit has determined that the Rehabilitation Act (RA) applies to state prisons that accept federal funds. *Armstrong v. Wilson,* 124 F.3d 1019, 1022-23 (9th Cir. 1997). The requirements to show a violation of the RA are substantially similar to the ADA requirements. *See, e.g., Collings v. Longview Fibre Co.*, 63 F.3d 828, 832 n.3 (9th Cir. 1995). Like the ADA, an inmate cannot raise a viable RA claim based on the alleged denial of medical treatment. *Burger v. Bloomberg*, 418 F.3d 882 (8th Cir. 2005).

Plaintiff argues that he is not claiming that defendants did not treat his disability, but he is claiming that they used his disability to ensure he would not receive treatment. Dkt. 96, at 39. Claims that a plaintiff was discriminatorily precluded from access to medical treatment altogether may constitute a violation under the ADA and RA. *Hughes v. Colorado Dep't of Corr.*, 594 F. Supp. 2d 1226, 1241 (D. Col. 2009). However, the record does not show that plaintiff was ever denied access to medical treatment altogether. Instead, plaintiff challenges the treatment decision not to send him for a neurology consultation. Plaintiff's claims are therefore premised on inadequate medical treatment, rather than entire denial of care. As such, his claims are not cognizable under the ADA or RA and the undersigned recommends that the Court dismiss these claims.

1

***Plaintiff's Motion for Appointment of an Independent Expert***

2       Finally, plaintiff has moved for an independent medical expert under Federal

3   Rule of Evidence 706. Dkt. 86. Plaintiff claims that the expert will assist the Court in

4   understanding the record, but given that plaintiff's given reasons revolve around

5   bolstering his own arguments, the undersigned finds that plaintiff request is essentially

6   requesting the Court to order assistance for plaintiff's case. *See* Dkt. 86, at 2 (claiming

7   that plaintiff needs a new expert to interpret facts for the Court since he was unable to

8   secure his outside medical provider as an expert); Dkt. 86, at 1 (asserting that the

9   granting an independent expert would compensate plaintiff for the Court's prior denial of

10   a preliminary injunction to order plaintiff his own neurologist).

11       Based on the scheduling order in this case, the undersigned finds this motion

12   untimely as filed after the close of discovery. *See* Dkt. 85. Furthermore, plaintiff has not

13   met the criteria of FRE 706 and shown that plaintiff's deliberate indifference claims are

14   so complex that the Court would deem an expert necessary to its understanding of the

15   case. *See Walker v. American Home Shield Long Term Disability Plan*, 180 F.3d 1065,

16   1070-71 (9th Cir. 1999). Plaintiff argues that an expert is necessary to explain the

17   significance of his symptoms to the Court. As discussed above, even assuming all facts

18   in favor of plaintiff, the application of the Eighth Amendment standard of deliberate

19   indifference remains a legal exercise that may be resolved without further explanation of

20   plaintiff's cognitive disorder. Therefore, plaintiff's motion for an independent medical

21   expert should be **denied**.

22

23

24

25

1

## IN FORMA PAUPERIS STATUS ON APPEAL

2      The Court must also decide whether plaintiff's *in forma pauperis* status should

3   continue on appeal. *See* 28 U.S.C. §1915(a)(3) ("an appeal may not be taken *in forma*

4   *pauperis* if the trial court certifies in writing that it is not taken in good faith"). The Court

5   must determine whether appeal is frivolous or malicious, or whether it fails to state a

6   claim on which relief may be granted. *See* 28 U.S.C. §1915(e)(2)(B)(i)&(ii).

7      While the undersigned was not persuaded on the merits of plaintiff's claim, there

8   is no evidence that his appeal is frivolous or is taken in bad faith. Accordingly, the

9   undersigned recommends that *in forma pauperis* status should continue on appeal.

10

## CONCLUSION

11

12     Based on the foregoing discussion, the undersigned recommends the Court

13  grant defendants' motion for summary judgment and dismiss plaintiff's complaint.

14     The parties have **fourteen (14) days** from service of this Report and

15  Recommendation to file written objections thereto. 28 U.S.C. § 636(b)(1); FRCP 6;

16  FRCP 72(b). Failure to file objections will result in a waiver of those objections for

17  purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). Accommodating this time

18  limitation, this matter shall be set for consideration on **March 6, 2020**, as noted in the

19  caption.

20     Dated this 19th day of February, 2020.

21

22

23  Theresa L. Fricke
    United States Magistrate Judge

24

25

REPORT AND RECOMMENDATION - 24